**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BRIAN J. STRAUSS, Individually, and d/b/a 1572 North Milwaukee Avenue Building Corporation, an Illinois corporation,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | No. 17 C 5348 |
| **THE CITY OF CHICAGO, a municipal corporation, and ALDERMAN PROCO JOE MORENO,** | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Brian Strauss owns valuable real estate in Chicago's Wicker Park neighborhood. Until recently, the ground floor of his building at 1572 North Milwaukee Avenue was occupied by an iconic rock club known as the Double Door. In 2015, however, Strauss initiated legal action against Double Door's owners for various lease violations. This action did not sit well with the local alderman, Defendant Proco Joe Moreno, who responded by proposing changes to the property's zoning restrictions. Strauss filed suit in this court, alleging a host of state and federal claims, and then amended the complaint after the Chicago City Council later adopted a variation of Moreno's proposed ordinance. Defendants now move to dismiss. For the reasons explained below, Defendants' motion [35] is granted.

## BACKGROUND

Plaintiff Brian J. Strauss is a resident of Illinois and the president of 1572 North Milwaukee Avenue Building Corporation. (Second Am. Compl. (hereafter "SAC") [32] ¶ 5.) That Corporation's sole asset is real property it owns and operates at 1572 North Milwaukee Avenue in Chicago, Illinois. (*Id.*; Pl.'s Resp. Br. [42], at 10.) The property consists of a four-story, mixed-use building near the intersection of Milwaukee Avenue, North Avenue, and Damen Avenue, the heart of a thriving commercial district on Chicago's near-northwest side. (*Id.*) The property shares

its southeast wall with another mixed-use building.  (*Id.* at ¶ 54.)  The property's southwest wall abuts elevated rail tracks operated by the Chicago Transit Authority.  (Ex. 5 to Pl.'s Resp. Br.)

The Strauss family's involvement with the property stretches back more than forty years. (SAC ¶ 10.)  Brian's father, Harry Strauss, began leasing commercial space there in 1977, and purchased the entire building "a few years later."  (*Id.* at ¶ 11.)  At some point, Harry transferred ownership of the property to the Corporation of which Brian is now the president.  (*Id.* at ¶ 12.) By the mid-2010s, when the events giving rise to this lawsuit are alleged to have occurred, the building at 1572 North Milwaukee Avenue had become "attractive to business tenants and prospective purchasers."  (SAC ¶ 14.)  In Brian's estimation, the market value of the building "was approximately 10 million dollars" at the time the parties' dispute arose.  (*Id.* at ¶ 15.)

That market value was affected by the municipal zoning regulations to which the property and its neighbors were subject.  From 1974 until 2017, Chicago's zoning ordinance classified 1572 North Milwaukee Avenue as "B3-2."  (*Id.* at ¶ 16.)  At all times relevant to this suit, "all other buildings along the Milwaukee-North-Damen corridor ha[d] B3-2 or greater zoning."  (*Id.* at ¶ 18.) The "B3-2" classification meant that the upper floors of the properties could be used as residential apartments while the ground floors could be used as taverns, restaurants, and, among other things, entertainment venues with a maximum occupancy of up to 999 persons.  *See* MUN. CODE OF CHICAGO § 17-3-0207.  As of 2017, the upper floors of 1572 North Milwaukee Avenue were divided into eleven apartments, and its ground floor featured 10,000 square feet of commercial space.  (*Id.* at ¶ 14.)

Prior to 2016, Plaintiff leased some or all of this commercial space to an entity called Double Door Liquors, Inc. (hereafter "Double Door").  (*Id.* at ¶ 19.)  Plaintiff's Amended Complaint provides no details about the identity of his former commercial tenant, the court takes judicial notice of the fact that Double Door was a well-known bar and live-music performance venue.  FED. R. EVID. 201(b)(1); WIKIPEDIA, *Double Door*, http://en.wikipedia.org/wiki/ Double_Door (last visited Sept. 28, 2018).

According to Plaintiff, "[n]umerous problems existed during the landlord-tenant relationship between [Brian Strauss] and Double Door." (SAC ¶ 19.) These problems included "constantly high noise levels," "drug and alcohol abuse by [Double Door's] customers," and "extensive . . . damage to the property." (*Id.*) At some point, Double Door "fail[ed] to pay percentage rent" and "fail[ed] to properly exercise" an option to renew its lease. (*Id.*)

In late 2015, Plaintiff filed a forcible entry and detainer lawsuit against Double Door in the Circuit Court of Cook County, Illinois—presumably due to one or more of the problems cited above, though the pleadings are not explicit on this. (*Id.* at ¶ 20.) The lawsuit attracted the attention of the local alderman, Defendant Proco Joe Moreno, who Plaintiff alleges "had a personal and financial relationship with the owners of Double Door." (*Id.* at ¶ 21.) Plaintiff does not offer any details about the nature of this "personal and financial relationship," though he alleges that Alderman Moreno told Plaintiff years ago, at some point in 2012, that "only Double Door would be allowed in Strauss' building." (*Id.* at ¶ 22.)

In April 2016, "just before" Plaintiff's forcible entry lawsuit was scheduled to go to trial, Defendant Moreno introduced an ordinance to the Chicago City Council's Zoning Committee, a body comprised of Moreno himself, Alderman Daniel Solis (the Committee's chairman), and 16 other members of the City Council. (*Id.* at ¶¶ 8, 23-24.) This ordinance would have changed the zoning classification of the property at 1572 North Milwaukee Avenue from B3-2 to B1-1. (*Id.* at ¶ 24.) A B1-1 classification "allows for fewer options for the type of commercial or retail tenants" than a B3-2 classification. (*Id.*) The B1-1 classification, for example, would bar Plaintiff from using the property's commercial space for "general restaurants, medium and large entertainment venues, and hotels or motels." (*Id.* at ¶ 28.)[1] The proposed change would not have applied to any other neighborhood properties. (SAC ¶ 23.)

---

[1]     Plaintiff also alleges that the B1-1 classification would bar Plaintiff from "tak[ing] new leases" for the apartment units on the building's upper floors, but this does not obviously follow from the language of the ordinance, *see* MUN. CODE OF CHICAGO § 17-3-0207, and the court

The Zoning Committee never sent Moreno's April 2016 downzoning proposal to the full City Council for a vote. (*Id.* at ¶ 37.) But the Committee did not reject the proposal, either. Instead, it "held Moreno's downzoning proposal in committee," thereby "making it available to be called for a vote at any time in the future." (*Id.*)

At some point in the summer of 2016, both Moreno and a co-owner of Double Door (an individual by the name of Sean Mulroney, who is not a party here) told Plaintiff that Moreno had "introduced the downzoning ordinance to protect Double Door by making the property less appealing to future renters." (*Id.* at ¶ 26.) On or around July 19, 2016, Plaintiff met with Moreno at Moreno's office, and Moreno repeated his earlier assertion that "only Double Door would be allowed in Strauss' building." (*Id.* at ¶ 38.)

On August 15, 2016, the Circuit Court of Cook County found that Double Door had indeed breached the terms of its lease with Plaintiff, and ordered Double Door to vacate the premises by December 31, 2016. (*Id.* at ¶ 40.) It is not clear exactly what happened next, but Double Door apparently did not vacate the property until February 6, 2017, more than a month after the deadline set by the Circuit Court of Cook County. (*Id.* at ¶ 41.) Two days later, on February 8, Plaintiff and Defendant Moreno attended a private meeting at Chicago's City Hall, which was convened by the City's Commissioner of Planning and Development, David L. Reifman. (*Id.* at ¶ 42.) Also present at this meeting were Double Door's co-owners, Zoning Committee Chairman Daniel Solis, Zoning Administrator Patricia A. Scudiero, and an assistant to Mayor Rahm Emanuel named Claudia E. Chavez. (*Id.*) Reifman began the meeting by advising the parties that he did not want to discuss Moreno's April 2016 downzoning proposal. (*Id.* at ¶ 44.) Reifman then "tried to broker a sale of [the property at 1572 North Milwaukee Avenue] between Strauss and Double Door for a purchase price far less than what the building was worth." (*Id.*) Both Plaintiff and

---

need not accept Plaintiff's legal conclusions as true, *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

Double Door rejected Reifman's proposal.[2]  (*Id.*)  The meeting's participants then began to discuss Moreno's April 2016 downzoning proposal, even though Reifman had suggested that they avoid this topic.  (*Id.* at ¶ 45.)  Moreno "warned Strauss that if Double Door wasn't allowed back into the building, Moreno would make the zoning process a very lengthy and expensive one." (*Id.*) None of the other participants at the meeting commented on Moreno's warning, but Zoning Committee Chairman Solis "nodded quietly at times and passively expressed approval." (*Id.* at ¶ 46.)

On February 25, 2017, Moreno spoke with Strauss on the sidewalk in front of 1572 North Milwaukee Avenue.  (*Id.* at ¶ 47.)  During this conversation, Moreno warned Strauss that "you're not gonna have a tenant in here for three years . . . . It's gonna be an empty building with no income for you or your family." (*Id.*)  Moreno also told Strauss that "I'm gonna have inspectors in here on a daily basis, you watch." (*Id.*)

On or about May 10, 2017, an unidentified individual agreed in writing to purchase the property for $9.6 million, on the condition that Strauss "inform" the individual "of any pending zoning change." (*Id.* at ¶ 49.)  The individual subsequently "cancel[led]" the contract with Strauss on June 8, 2017, two days after Moreno unveiled a second proposal to downzone the property. (*Id.*)  Unlike Moreno's earlier proposal, which would have changed the property's classification from B3-2 to B1-1, this new proposal would change the classification of the property to RS-3.  (*Id.* at ¶ 51.)  That classification "is intended to accommodate the development of single-unit detached houses on individual lots." (*Id.* at ¶ 52.)  All other parcels on both Milwaukee and Damen Avenues "for at least a half-mile on either side of Strauss' property" are "solidly zoned for commercial/business" uses, and they would continue to be so zoned under Moreno's second proposal to reclassify Plaintiff's property.  (*Id.* at ¶ 55.)  On June 22, 2017, the Zoning Committee

_____

[2]        It is clear why Plaintiff would refuse to sell the building for "far less" than it was worth, but he does not offer an explanation for Double Door's alleged rejection of the proposed deal.

"deferred" Moreno's second proposal. (*Id.* at ¶ 63.) As with Moreno's first proposal, this action made the ordinance "available to be called for a vote at any time in the future." (*Id.*)

Plaintiff subsequently attempted to lease the commercial space formerly occupied by Double Door to other commercial lessees. Although he "received several written letters of intent from restaurants to rent that space at market rates"—approximately $35,000 per month—"these potential tenants refused to sign a lease" due to concerns that the property's zoning classification would not "remain at B3-2." (*Id.* at ¶ 50.)

On July 20, 2017, Plaintiff filed suit in this court, alleging that Moreno and the City of Chicago violated his constitutional rights. (*Id.* at ¶ 64.) The following day, a different individual (also unidentified in the Second Amended Complaint) offered to purchase Plaintiff's building, this time for $9.1 million. (*Id.* at ¶ 66.) Plaintiff alleges that this individual "knew of the pending downzoning amendments," though he does not specify when or how this individual became aware of them. (*Id.* at ¶ 66.) On August 7, 2017, after meeting with Defendant Moreno, the individual "cancelled" the purchase agreement. (*Id.*)

Later that month, Moreno introduced a third proposal directed at Plaintiff's property. (*Id.* at ¶ 70.) This ordinance would reclassify Plaintiff's property (and no others) as B2-2, a classification "intended to spur development in commercial corridors with low demand for retail." (*Id.* at ¶¶ 70-71.) The B2-2 classification would permit "permit fewer options for the types of commercial or retail tenants" than the existing B3-2 classification. (*Id.* at ¶ 73.)

Plaintiff suggests that several city officials "worked with [Moreno] to devise this third proposal," including Zoning Administrator Patricia Scudiero, Alderman Solis, and unidentified "members of the Department of Law." (*Id.* at ¶ 69.) But Plaintiff also alleges that, during a subsequent hearing on the proposal, Scudiero told the Zoning Committee that neither the City's Department of Planning nor its Department of Law could "recommend the actions of Moreno." (*Id.* at ¶ 67.) It is not clear to which of Moreno's "actions" Scudiero was referring, or what she or anyone else who allegedly "worked with" Moreno actually said to him.

On September 11, 2017, the Zoning Committee voted to approve the proposed ordinance—apparently in the same form Moreno had proposed in late August, though the Amended Complaint is not entirely clear on this point. (*Id.* at ¶ 83.) In doing so, the Committee acted pursuant to an "unwritten tradition of 'Aldermanic Prerogative,'" whereby city council members "defer[ ] local matters to the alderman of the affected ward" and "blindly support" that alderman's position on such matters, "knowing full well that they will get the support they need from that colleague, should they want to pass zoning legislation in their ward in the future." (*Id.* at ¶¶ 84-85.)

At some point that same day, Moreno made the following remark to his Chief of Staff, Raymond Valadez, while the two men were speaking in City Hall Chambers: "Fuck with them, it makes their lawsuit weaker." (*Id.* at ¶ 81.) It is not obvious to whom the word "them" refers in this sentence, or what exactly Moreno believed would make "their" lawsuit weaker. Plaintiff implies— and the court assumes, for purposes of this motion—that Moreno was referring to Plaintiff and the downzoning ordinance, respectively. Plaintiff alleges that this comment "was recorded," though he does not explain who recorded it or how he or she did so. (*Id.* at ¶ 82.)

On September 21, the unidentified individual who had previously offered to purchase Plaintiff's building for $9.1 million reduced his or her offer to $6.5 million. (*Id.* at ¶ 87.)

On October 11, 2017—more than a year after Plaintiff prevailed in his state-court lawsuit against Double Door—the full City Council enacted the third iteration of Moreno's proposal into law. (*Id.* at ¶ 88.)

As noted, Plaintiff filed his original Complaint in this matter on July 20, 2017, before Defendant Moreno introduced the third and final iteration of his proposal to rezone Plaintiff's property. Plaintiff filed a First Amended Complaint [21] shortly after the City Council enacted that proposal into law, and a Second Amended Complaint [32] on November 30, 2017. The Second Amended Complaint includes eighteen counts alleging deprivations of various rights under the Illinois and United States constitutions, as well as claims for conspiracy, tortious interference with

contract, tortious interference with prospective economic advantage, and intentional infliction of emotional distress. (*See* SAC ¶¶ 108-213.) Plaintiff names only Alderman Moreno and the City of Chicago as Defendants, and they now move to dismiss all of Plaintiff's claims under Rule 12(b)(1) and/or Rule 12(b)(6).

### DISCUSSION

Defendants argue that Plaintiff lacks standing, that Plaintiff's federal claims are unripe, that Alderman Moreno is entitled to absolute and/or qualified immunity from suit in his individual capacity, and that each of Plaintiff's individual claims fails on the merits. The court considers these arguments in turn. In doing so, it accepts well-pleaded facts as true and draws all reasonable inferences in Plaintiff's favor. *See Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016).

### I.      Standing

Defendants first suggest that Brian Strauss lacks standing to assert rights that properly belong to the corporation of which he is president. Even if that corporation has few or no other shareholders, they argue, none of those shareholders "have standing to sue for harms to the corporation, even for the derivative harm to themselves that might arise from a tort or other wrong to the corporation." *Hammes v. AAMCO Transmission, Inc.*, 33 F.3d 774, 777 (7th Cir. 1994).

It is true, as Defendants point out, that some Seventh Circuit authority states that "[a] shareholder has no right to seek damages for an injury to the corporation, even if he is the sole shareholder," *Creek v. Vill. of Westhaven*, 80 F.3d 186, 191 (7th Cir. 1996). But there is also a "well-established exception [that] allows 'a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated.'" *Korte v. Sebelius*, 735 F.3d 654, 668 (7th Cir. 2013) (quoting *Franchise Tax Bd. of California v. Alcan Aluminium, Ltd.*, 493 U.S. 331, 336 (1990)).

The precise corporate form at issue in this case is not clear from the pleadings. Nor is the court certain of the precise relationship between Brian Strauss and the corporation, beyond the

fact that he is its "president." The caption to Plaintiff's Second Amended Complaint states that he is suing as an individual and "d/b/a 1572 North Milwaukee Avenue Building Corporation."

This court is satisfied that Brian Strauss's own financial interests are sufficiently implicated here to meet the constitutional standing requirements of injury, causation, and redressability. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Whatever additional limitations might exist on his ability to recover for injuries to the corporation are prudential, rather than jurisdictional, and relate to the merits of his claims for relief. *Korte*, 735 F.3d at 668 ("Like other rules of third-party standing . . . the shareholder-standing rule is a prudential limitation and does not affect the court's authority to hear the case."); *Hammes*, 33 F.3d at 778 (whether shareholders were entitled to damages for "the injury to their corporation" was "a question about the merits."). That alone is sufficient to reject Defendants' standing argument as a basis for dismissal under Rule 12(b)(1). And the court's uncertainty about the precise corporate form at issue justifies deciding Defendants' 12(b)(6) motion on other, "more straightforward" grounds. *Gianfresco v. Town of Wrentham*, 712 F.3d 634, 637 (1st Cir. 2013) (deferring consideration of restaurant proprietor's statutory standing to challenge the validity of municipal land-use regulations as applied to property owned by the restaurant itself).

## II.    Ripeness

Defendants next argue that none of Plaintiff's constitutional claims are ripe for adjudication, because Plaintiff has not yet sought and been denied compensation in a state-court action for inverse condemnation. This argument is premised on the special ripeness doctrine announced in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). In that case, a county legislature in Tennessee reduced the permissible residential density of an area where a developer had already obtained preliminary approval to build a residential subdivision. Although the county's planning commission permitted part of the subdivision to be constructed under the standard that existed when the developer first sought approval, it imposed the new standard on the remainder of the developer's property. The

developer then sued for damages in federal court, characterizing the planning commission's action as a regulatory taking in violation of the Fifth Amendment.

For two reasons, the Supreme Court concluded that the dispute was not yet ripe. First, the developer had not requested a "variance"—that is, an individualized exemption from otherwise generally applicable rules—from the county's Board of Zoning Appeals, which had the authority to grant such variances. Because there had been no "final decision that no variances would be granted," the Court explained, the plaintiff had not yet suffered a legally cognizable injury. *Id.* at 190. The Court's second reason for finding the taking claim to be unripe was similar: the developer had not sought compensation for the alleged taking in a state-court action for inverse condemnation. Tennessee law authorized such actions where the alleged taking was caused by restrictive zoning or development regulations. *Id.* at 196. "If the government has provided an adequate process for obtaining compensation," the Supreme Court explained, "and if resort to that process yields just compensation, then the property owner has no claim against the Government for a taking." *Id.* at 194-95 (internal quotation marks omitted).

The prerequisites for a federal lawsuit announced in *Williamson*—a final administrative decision and a state-court action for inverse condemnation—apply only to alleged regulatory takings and closely related constitutional claims. These prerequisites, the *Williamson* Court explained, are "compelled by the very nature of the inquiry required by the Just Compensation Clause." *Id.* at 190. Two "factors of particular significance" in determining whether a regulation amounts to a taking are "the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations." *Id.* (citing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)). As a practical matter, these factors "simply cannot be evaluated" until a plaintiff has obtained final administrative and state-court decisions. *Id.* at 191. Until the plaintiff does so, the scope and character of the injury for which he seeks redress is too uncertain—if it exists at all—to be justiciable under Article III.

The Seventh Circuit has interpreted *Williamson* broadly in the land-use context.  In *River Park, Inc. v. City of Highland Park*, for example, it declared that "Federal courts are not boards of zoning appeals," and suggested that the *Williamson* prerequisites apply not only to takings claims, but also to any other constitutional claim requiring analysis of the scope of an economic injury arising from governmental interference with the value of physical property.  23 F.3d 164, 165, 167 (7th Cir. 1994) ("The remedy for excessive regulation is a [state-court] suit for invalidation or inverse condemnation . . . . [A] property owner may not avoid *Williamson* by applying the label 'substantive due process' to the claim.  So too with the label 'procedural due process.'  Labels do not matter.") (citation omitted).  But the Seventh Circuit has also made it clear that the *Williamson* prerequisites do not apply to "*bona fide* equal protection claims."  *Flying J. Inc. v. City of New Haven*, 549 F.3d 538, 543 (7th Cir. 2008).  To qualify for this exception, a land-use litigant must plead either "(1) the malicious conduct of a government agent, in other words, conduct that evidences a spiteful effort to 'get' him for reasons unrelated to any legitimate state objective; or (2) circumstances, such as prayer for equitable relief and a claim that would evaporate if the government treated everyone equally that sufficiently suggest that the plaintiff has not raised just a single takings claim with different disguises."  *Id.* (citation and quotation marks omitted).  *See also Miller v. City of Monona*, 784 F.3d 1113 (7th Cir. 2015) (plaintiff-landowner's "class-of-one" equal-protection claim was ripe, where it focused on the alleged arbitrariness of the city-defendant's selective regulatory enforcement and not the scale of the plaintiff's economic injury).

In this case, the takings claim in Count IV of the Second Amended Complaint is clearly premature, as Strauss does not allege that he has been denied just compensation in a state-court action for inverse condemnation.[3]  Although Plaintiff believes that "[p]ursuing state remedies" will

---

[3]   Strauss did file suit against Defendants in the Circuit Court of Cook County on January 8, 2018—several months after he filed this lawsuit—alleging similar claims to those in the Second Amended Complaint at issue here.  Defendants removed that suit to federal court, and it has been stayed pending resolution of Defendants' motion to dismiss in this case.  *See Strauss v. City of Chicago*, No. 18 C 961 (Filed Feb. 6, 2018).  The mere act of *filing* a state-court

deprive him of the right to a jury trial and "may" prevent him from recovering damages and attorney fees (*see* Pl.'s Resp. Br. 9), he offers no explanation for this belief. His vague, speculative allegations about the purported inadequacy of Illinois' process for obtaining just compensation do not relieve him of the obligation to exhaust that process before filing a federal lawsuit.

So too with the procedural due process claim in Count III of the Second Amended Complaint, which raises the same core issue as Plaintiff's takings claim. Plaintiff makes much of the alleged animus that Defendant Moreno demonstrated when he confronted Plaintiff outside the building at 1572 North Milwaukee Avenue. But this alleged animus would only deprive Plaintiff of due process if the resulting government action reduced his property's value so severely that it necessitated something more than the "scant process" usually required in the land-use regulatory context. *River Park*, 23 F.3d at 167 ("[I]n zoning cases . . . the due process clause permits municipalities to use political methods to decide[.]"); *cf. City of Los Angeles v. David*, 538 U.S. 715, 716-17 (2003) (applying traditional three-factor procedural due process test to a municipality's 27-day, pre-hearing impoundment of plaintiff's automobile). Because a determination of whether Strauss received sufficient process would require the court to consider the same issue that makes his regulatory takings claim premature—the scope of the economic injury he suffered—it too is premature under *Williamson*.

That leaves Plaintiff's equal protection claim in Count I, his First Amendment claim in Count II, and his substantive due process claim in Count III. None of these claims are premised on an allegation of *excessive* regulation, as Plaintiff's takings and procedural due process claims are. Rather, each focuses on allegations of disparate treatment, irrationality, and/or improper retaliatory motivation. Plaintiff's alleged injury in these claims occurred as soon as the government carried out the alleged discriminatory, irrational, or improperly motived actions. The logic of *Williamson* therefore does not apply. *See Oxford Bank & Tr. & Fifth Ave. Prop. Mgmt. v.*

---

lawsuit—after Defendants filed their motion to dismiss in this case—does not satisfy *Williamson*, as the state court has not yet *denied* Strauss just compensation.

*Vill. of La Grange*, 879 F. Supp. 2d 954, 963 (N.D. Ill. 2012) (Tharp, J.) (*Williamson* inapplicable to landowner's claim that municipal restriction on pawn shops was "motivated by animus and improper motive"). True, Plaintiff does seek damages as well as injunctive relief for these injuries, suggesting the possibility that he is attempting to smuggle his premature claims into federal court under a different label. But the amount of damages Plaintiff suffered will not determine whether his remaining Federal claims succeed or fail. Those claims are therefore "sufficiently different from a true takings claim to avoid *Williamson County's* ripeness requirement." *Id.*

### III.    Immunity

Defendant Moreno argues that he is entitled to absolute legislative immunity from all Plaintiff's claims. Local officials are immune from civil liability for "all actions taken in the sphere of 'legitimate legislative activity.'" *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). Such actions include "(1) core legislative acts such as introducing, debating, and voting on legislation; (2) activities that could not give rise to liability without inquiry into legislative acts and the motives behind them; and (3) activities essential to facilitating or preventing the core legislative process." *Biblia Abierta v. Banks*, 129 F.3d 899, 903 (7th Cir. 1997).

Plaintiff concedes that the acts of "introducing" and voting on municipal ordinances ordinarily fall within the scope of legislative immunity. (*See* Pl.'s Resp. Br. 12.) But he maintains that the ordinances at issue in this case were not "legislative" in nature, either because they targeted a single property or because they were intended to serve "a personal rather than a public interest." (*Id.* at 13.) The latter argument can be easily dismissed, as both the Supreme Court and the Seventh Circuit have squarely held that "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 55; *Bagley v. Blagojevich*, 646 F.3d 378, 385 (7th Cir. 2011).[4] Plaintiff's first argument—that the

---

[4]    Insofar as Plaintiff is arguing that legislation lacking any rational basis cannot provide a basis for legislative immunity because it is not "legitimate" in the constitutional sense,

narrow scope of the ordinances renders them "administrative" rather than "legislative" in nature—requires more detailed consideration.

The separation of powers at the local level of government tends to be less rigid than at the state and federal levels. *See, e.g.*, *Land & Lakes Co. v. Illinois Pollution Control Bd.*, 245 Ill. App. 3d 631, 638-39, 616 N.E.2d 349, 353-54 (3d Dist. 1993) (state law authorizing municipal legislatures to adjudicate certain disputes relating to siting of landfills did not violate separation-of-powers clause of Illinois Constitution). Plaintiff suggests that a municipal zoning ordinance that applies to only one parcel of property should be deemed "administrative" for purposes of immunity doctrine, even if that ordinance was considered and enacted by a representative body such as the Chicago City Council. For support, Plaintiff cites the Sixth Circuit's decision in *Haskell v. Washington Township*, which states that "[a]lthough zoning is ordinarily a legislative activity, it is not always legislative for purposes of immunity." 864 F.2d 1266, 1278 (6th Cir. 1988). A zoning action that "establish[es] general policy" is legislative, the court explained, but if "the action 'single[s] out specific individuals and affect[s] them differently from others,' it is administrative." *Id.* (citation omitted).

At least one court in this district has cited *Haskell* approvingly. *See Chicago Miracle Temple Church v. Fox*, 901 F. Supp. 1333 (N.D. Ill. 1995) (Castillo, J.) (finding that the introduction and enactment of municipal ordinances authorizing the purchase of specific land parcels were administrative because they did not "concern[ ] the enactment or promulgation of public policy."). Since then, however, the Seventh Circuit has made it clear that "the availability of absolute immunity does not depend on the number of people that a law happens to affect at the time of its passage." *Biblia Abierta v. Banks*, 129 F.3d 899, 904 (7th Cir. 1997). *Biblia Abierta* involved a

---

he is similarly off base. The applicability of legislative immunity turns on whether an allegedly unlawful action can be legitimately classified as legislative in nature, not whether a concededly legislative action can withstand constitutional scrutiny on the merits.

plaintiff who planned to use its property as a church, and to that end applied for a special use permit from Chicago's Board of Zoning Appeals. While the plaintiff's application was pending, the local alderman introduced (and the City Council subsequently enacted) an ordinance rezoning the property in a way that prevented its use as a church, even with a special use permit. The plaintiff then sued the alderman in federal court, alleging violations of its rights under the First and Fourteenth amendments. The district court rejected the alderman's assertion of absolute legislative immunity, but the Seventh Circuit reversed. The act of "rezoning a single parcel" qualified as "legitimately legislative" activity, the court explained, because the new zoning classification created "neutral, prospective rules that apply to all current and future owners of the property." *Id.* at 904-05.

Plaintiff makes no attempt to distinguish *Biblia Abierta* in his response. He does not, for example, suggest that the rezoning of 1572 North Milwaukee Avenue would not affect future owners of the property. Indeed, he strongly implies the opposite when he alleges that Alderman Moreno's proposals either scared off prospective purchasers or led them to reduce their offering price. This is a problem for his claims against Moreno. Because the Seventh Circuit has held that zoning ordinances are legislative acts even when they are aimed only at a single parcel, this court concludes that Defendant Moreno is immune from civil liability premised on his introduction of, and votes in favor of, the ordinances at issue in this case.

Moreno is shielded by legislative immunity from liability for his other allegedly unlawful actions, as well. Plaintiff contends that Moreno threatened to interfere with Plaintiff's ability to find a new commercial tenant because Plaintiff evicted Double Door, and that these threats were not legislative acts. But Plaintiff does not say why Moreno's acts were not legislative; Moreno's alleged threats described the potential financial impact of proposed legislation. This court concludes that explaining the purpose and potential consequences of proposed legislation to constituents is "inextricably intertwined with the legislative process of introducing and voting on the zoning ordinances and cannot be separated from those legislative functions." *Biblia Abierta*,

129 F.3d at 906. The court assumes, based upon Plaintiff's allegations, that the motivation underlying Moreno's statements was to intimidate Plaintiff because of the legal action against Double Door, but the existence of such an improper motive does not strip Moreno of legislative immunity. *See Bagley*, 646 F.3d at 391 ("Government officials are entitled to legislative immunity when their actions 'stripped of all considerations of intent and motive' are legislative.") (quoting *Bogan*, 523 U.S. at 55); *Biblia Abierta*, 129 F.3d at 903 ("[A]bsolute immunity shields a legislator's conduct even when that conduct is based on improper motives."). Defendant Moreno is immune from civil liability for the conduct at issue in this case.

## IV. Equal protection and substantive due process claims

In counts I and III of the Second Amended Complaint, Plaintiff asserts equal protection and substantive due process claims against the City of Chicago, premised on the City Council's enactment of the ordinance that rezoned Plaintiff's property. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (municipality can be liable under 42 U.S.C. § 1983 for "a single decision by its properly constituted legislative body"). These claims fail on the merits, because Plaintiff's Second Amended Complaint itself offers a rational basis for the rezoning of Plaintiff's property: mitigating the "constantly high noise levels" and drug and alcohol abuse that accompanied the property's use as an entertainment venue. (SAC ¶ 19.)[5]

Even if Alderman Moreno was not particularly concerned about these issues—Plaintiff alleges that Moreno was motivated solely by his animus toward Plaintiff and/or his unspecified personal and financial connections to Double Door—other members of the City Council could have supported the ordinance because of the possibility that it would mitigate problems such as noise pollution and crime. "Allegations of animus do not overcome the presumption of rationality"

---

[5] The property's new B2-2 zoning classification precludes its use as an entertainment venue having a maximum occupancy of greater than 149 persons. It also precludes use of the property as a tavern, a hotel, an "entertainment cabaret," or a banquet hall, among other potential sources of noise pollution and substance abuse. *See* Mun. Code of Chi. § 17-3-207.

this court must apply to the City Council's action for purposes of Plaintiff's "class-of-one" equal protection and substantive due process claims. *Flying J.*, 549 F.3d at 548; *Guth v. Tazewell Cty.*, 698 F.3d 580, 586 (7th Cir. 2012). "It is only when courts can hypothesize no rational basis for the action that allegations of animus come into play." *Id. See also Miller*, 784 F.3d at 1123 ("[T]o succeed on a class-of-one claim, Miller had to do more than merely allege facts casting the actions of Monona officials as being motivated by animus; she needed to exclude possible rational explanations for their actions."). Nor does it matter that the ordinance did nothing to combat noise and crime stemming from *other* properties in the vicinity. Where, as here, a legislative action neither implicates a fundamental right nor engages in "invidious discrimination," the government "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 489 (1955). *See also Lamers Dairy, Inc. v. U.S. Dep't of Agriculture*, 379 F.3d 466, 477 (7th Cir. 2004) ("incremental regulation" permissible under rational-basis review). Plaintiff's equal protection and substantive due process claims fail because there was a rational basis for the City Council's action.

## V.     First Amendment retaliation claim

Plaintiff's retaliation claim under the First Amendment is more complicated. To avoid dismissal of this claim, Plaintiff must plausibly allege (1) that he was "engaged in activity protected by the First Amendment," (2) that he "suffered a deprivation that would likely deter First Amendment activity in the future," and (3) that "the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008).

Plaintiff's state-court lawsuit against Double Door was protected conduct under the petition clause of the First Amendment. *See Guth*, 698 F.3d at 585-86 (lawsuits "designed to rectify a private grievance" are protected conduct under the petition clause). But Plaintiff's allegations do not satisfy the other elements of a First-Amendment retaliation claim. The City Council's adoption

of an ordinance limiting Plaintiff's use of his property easily qualifies as a deprivation likely to deter Plaintiff's protected conduct in the future. But Plaintiff has not alleged facts that would establish causation. Apart from Moreno himself, Plaintiff has not alleged that any members of the City Council were motivated by retaliatory animus. Nor does he explain why, if a majority of the Council intended to retaliate against Plaintiff, they waited more than a year after he prevailed in his state-court lawsuit to act on their purported retaliatory intent. These holes in Plaintiff's narrative, together with the rational basis for the City Council's action described in the previous section, are sufficient to eliminate the City Council's passage of the rezoning ordinance as a basis for Plaintiff's retaliation claim. *See Guth*, 698 F.3d at 586 (affirming summary judgment for defendant county, where "only two" members of a county zoning board accused of retaliating against plaintiff "expressed irritation" about plaintiff's prior lawsuit against the county).

Plaintiff also suggests that he suffered a deprivation when Alderman Moreno told him that "you're not gonna have a tenant in here for three years," and that "I'm gonna have inspectors in here on a daily basis, you watch." "[W]here a public official's alleged retaliation is in the nature of speech," that speech "does not adversely affect a citizen's First Amendment rights" unless it involves a "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow." *Villagrana v. Vill. of Oswego*, No. 04 C 4603, 2005 WL 2322808, at *3 (N.D. Ill. Sept. 22, 2005) (Lefkow, J.) (quoting *Suarez Corp. Ind. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000)). Moreno's statements to Plaintiff involved a threat of adverse regulatory action. Such threats are deeply concerning, because "'the threat . . . 'of continued and heightened regulatory scrutiny' sometimes can have a chilling effect [on protected conduct], regardless of whether it ultimately results in sanctions being imposed." *Bennie v. Munn*, 822 F.3d 392, 399 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 812 (2017) (citation omitted). But not all threats of future regulatory actions because of past protected conduct are *per se* actionable under the First Amendment. The threatened regulatory action must be sufficiently burdensome and sufficiently "imminent" to reasonably deter future protected conduct. *See id.* at 399, 401 (affirming

district court's finding, after a bench trial, that a "person of ordinary firmness" would not have been "quieted" by regulators' warning to plaintiff's employer that it could face unidentified "administrative action" because of plaintiff's protected conduct).

In this case, it is not clear that the threatened regulatory action was sufficiently "imminent" to reasonably deter future protected conduct. In other cases where courts found that threats of adverse regulatory action could support a retaliation claim, the individual issuing the threat was an executive branch official with the power to initiate enforcement proceedings. In this case, in contrast, the threatening party is a single legislator who lacked the formal authority to carry out the threatened actions. *Compare Blankenship v. Manchin*, 471 F.3d 523 (4th Cir. 2006) (affirming denial of motion to dismiss retaliation claim premised on governor's public statement that additional regulatory "scrutiny" of plaintiff's business was warranted because plaintiff publicly opposed a bond referendum), *with X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 67-73 (2d Cir. 1999) (government contractor failed to state retaliation claim against legislators who, among other things, "asked government agencies to conduct investigations into its operations"). *But see Bondar v. D'Amato*, No. 06-C-109, 2007 WL 1700114, at *8 (E.D. Wis. June 11, 2007) (suggesting that tavern-owner plaintiffs could have prevailed on First-Amendment retaliation claim premised on the comments of a single municipal alderman if those comments had "intimat[ed] that [the alderman] would punish, sanction, or take an adverse governmental action" against the plaintiffs).

The court need not decide whether the threatened regulatory actions in this case were, in fact, sufficient to deter future protected conduct, because even if they were, Plaintiff could not collect damages from either Defendant. Moreno is entitled to legislative immunity from suit in his individual capacity, as the court has already explained. And the City of Chicago cannot be held liable for the constitutional torts of its employees or agents under a *respondeat superior* theory. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 694-95 (1978). Instead, to state a claim for municipal liability under 42 U.S.C. § 1983, a plaintiff must plausibly allege "that an official policy or custom not only caused the constitutional violation, but was 'the moving force' behind it." *Estate*

*of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). The existence of such an official policy or custom "may be established by means of an express policy," or by "a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy." *Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 675 (7th Cir. 2012). It also may be established "through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Id.*

Plaintiff does not allege any express municipal policy of retaliating against property owners who go to court to evict their tenants. Nor does he allege an unwritten-but-widespread practice of retaliating against such property owners—or even a practice of retaliating against property owners who evict friends of an Alderman. Plaintiff argues that "aldermanic privilege existed and allowed the constitutional harm to happen" in this case. (Pl.'s Resp. Br. 19.) But "allow[ing] the constitutional harm to happen" is not enough. Even if the court assumes that the practice of aldermanic privilege was sufficiently widespread, entrenched, and well-known to constitute a municipal custom for purposes of a Section 1983 claim, none of Plaintiff's allegations suggest that this custom was "the moving force" behind Alderman Moreno's *own* retaliatory actions, which this court has already found to be the only plausible basis for a constitutional claim here. Instead, Plaintiff repeatedly alleges that the driving force behind Moreno's actions was his personal animus toward Plaintiff and/or his personal friendship with one or more of Double Door's co-owners. (*See, e.g.*, SAC ¶¶ 36, 40, 45, 95, 117, 121, 171, 209.)

Some language in Plaintiff's response brief hints at a slightly different argument for municipal liability: that the practice of aldermanic privilege gave Alderman Moreno *de facto* "authority to make final policy decisions on behalf of the municipality." *Rice*, 675 F.3d at 675. If it were truly a foregone conclusion that Alderman Moreno's proposed legislation would be adopted verbatim by the full City Council, that might be enough to support municipal liability. But Plaintiff's conclusory allegation that such *de facto* authority existed here is contradicted by the rest of his

Second Amended Complaint, which describes a year-long process in which Moreno revised his proposed zoning change in response to criticism from others in City government, prior to a full vote of the City Council. Even if municipal liability *can* be premised on a single action by an official with merely *de facto* authority to commit the municipality to that action—a question this court does not decide—the various facts alleged in Plaintiff's Second Amended Complaint contradict his conclusory assertion that such *de facto* authority existed here. Plaintiff therefore has not plausibly alleged that it did. *See West Bend Mutual Insurance Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (allegations in plaintiff's complaint must "present a story that holds together" to avoid dismissal under Rule 12(b)(6)).

## VI. Conspiracy claims

In counts V and VI of the Second Amended Complaint, Plaintiff alleges a conspiracy to violate his civil rights among Alderman Moreno and the various city officials who attended the February 8, 2017 meeting in the office of David Reifman, the City's Commissioner of Planning and Development. According to Plaintiff, these officials "knew or should have known" from Moreno's comments at that meeting that his proposals to rezone Plaintiff's property were motivated solely by his "personal agenda to get revenge on behalf of Double Door." (SAC ¶¶ 134, 137.) The other officials at the meeting therefore "should have instructed" Moreno and/or the Zoning Committee to withdraw Moreno's proposed ordinances. (*Id.* at ¶ 139.) Instead, Plaintiff continues, the officials "worked with [Moreno] to come up with a downzoning proposal, post lawsuit, that was more defensible and consistent with maintaining the status quo of 'Aldermanic Prerogative.'" (*Id.*)

These allegations are insufficient to state a claim for multiple reasons. Even if the court assumes that the various city officials who participated in the February 8 meeting did, in fact, agree to violate Plaintiff's rights—a generous assumption, in light of Plaintiff's own allegation that several of the attendees at the meeting were members of the same city agencies that later refused to "recommend" Moreno's proposals to the Zoning Committee—Plaintiff's claims are still barred

by the so-called intra-corporate conspiracy doctrine. Under that doctrine, the agents of a corporation "jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." *Wright v. Illinois Dep't of Children & Family Services*, 40 F.3d 1492, 1508 (7th Cir. 1994) (quoting *Travis v. Gary Community Mental Health Center*, 921 F.2d 108, 110 (7th Cir. 1990), *cert. denied*, 502 U.S. 812 (1991)). The intra-corporate conspiracy doctrine applies to government entities as well as private ones, and, except in "egregious circumstances," to conspiracy claims under 42 U.S.C. § 1985. *Id.* Most courts in this district have held that it also applies to conspiracy claims under 42 U.S.C. § 1983. *See Stenson v. Town of Cicero*, No. 03 C 6642, 2005 WL 643334, at *7-9 (N.D. Ill. March 15, 2005) (Pallmeyer, J.) (citing cases).

Plaintiff argues that the doctrine does not apply here for one or more of the following reasons: (1) because individuals unaffiliated with the City also participated in the February 8 meeting, thereby broadening the conspiracy beyond the City's own employees; (2) because the conspiracy they hatched at that meeting was "unlawful," in that it was aimed at depriving Plaintiff of his civil rights; or (3) because the conspiracy was motivated solely by "personal bias" against Plaintiff, and thus was not undertaken within the course of the various co-conspirators' employment with the City. (*See* Pl.'s Resp. Br. 28.) None of these arguments are persuasive. The mere presence of Double Door's co-owners at the February 8 meeting—which was convened for the purpose of brokering their purchase of Plaintiff's building—does not make them co-conspirators in city officials' later efforts to "work with" Moreno to make his proposal more "defensible." *See Stenson*, 2005 WL 643334, at *9 n.23. And Plaintiff's suggestion that the intra-corporate conspiracy doctrine is categorically inapplicable to conspiracies aimed at the deprivation of civil rights is untenable in light of clear Seventh Circuit authority holding that the doctrine *is* applicable to conspiracy claims under Section 1985. *See Wright*, 40 F.3d at 1508; *Hartman v. Bd. of Trustees of Community College Dist. No. 508*, 4 F.3d 465, 469-70 (7th Cir.

1993).[6]  Finally, Plaintiff is correct that the doctrine does not extend to conspiracies motivated "solely" by the "personal bias" of the individual conspirators; such conspiracies do not implicate the interests of the conspirators' shared employer, and thus are not undertaken within the scope of their employment, *see Hartman*, 4 F.3d at 470, but that exception does not apply here.  Plaintiff has not alleged that anyone besides Moreno was motivated by "personal bias" against Plaintiff.  Instead, his allegation that other city officials sought to amend Moreno's proposals to make them "more defensible" suggests that their actions fall squarely within the scope of their employment by the City.  Their attempt to improve proposed legislation served the interests of the City, not themselves.  It represents precisely the type of "routine, collaborative business decision" that the intra-corporate conspiracy doctrine is intended to protect.  *Stenson*, 2005 WL 643334, at *9 (citations and quotation marks omitted).

Even if the court were to overlook the applicability of the intra-corporate conspiracy doctrine here, Plaintiff's allegations still would not state a claim for municipal liability.  As previously noted, Plaintiff does not allege any facts suggesting an official municipal policy or an entrenched, widespread practice of conspiring against property owners who go to court to evict their tenants.  Nor does he allege that the purported co-conspirators had final policymaking authority in any domain that is relevant to the alleged conspiracy.  As a result, his conspiracy claims against the City must be dismissed.

---

[6]    Plaintiff cites two cases from this district asserting that "[t]he deprivation of civil rights is unlawful and the intra-corporate doctrine only applies when members of a corporation are jointly pursuing the corporation's 'lawful business.'"  *Sassak v. City of Park Ridge*, 431 F. Supp. 2d 810, 821 (N.D. Ill. 2006) (Moran, J.); *Drager v. Village of Bellwood*, 969 F. Supp. 2d 971, 985 (N.D. Ill. 2013) (Leinenweber, J.).  Neither case explains how a sweeping exception for *all* civil-rights conspiracies can coexist with Seventh Circuit authority finding the intra-corporate conspiracy doctrine applicable—absent "extraordinary circumstances"—to conspiracy claims under Section 1985, *see Wright*, 40 F.3d at 1508; *Hartman*, 4 F.3d at 469-70.  Nor does either decision offer a reason why the Seventh Circuit's logic should not apply with equal force to conspiracy claims under Section 1983.  Most courts in this district have found that the intra-corporate conspiracy doctrine does apply to such claims.  *See Stenson*, 2005 WL 643334, at *7-9 (collecting cases); *Tabor v. City of Chicago*, 10 F. Supp. 2d 988, 994 (N.D. Ill. 1998) (Gettleman, J.) (same).

**VI.      Failure-to-intervene claim**

Finally, the court considers Plaintiff's claim in Count VII: that the City neglected its duty to prevent a conspiracy to violate Plaintiff's rights, pursuant to 42 U.S.C. § 1986.   That statute provides a cause of action for the failure to prevent only those "wrongs conspired to be done, and mentioned in section 1985[.]"  Because the court has already held that Plaintiff has not stated a claim under Section 1985, he has no claim under Section 1986, either.  *See Hicks v. Resolution Trust Corp.*, 970 F. 2d 378, 382 (7th Cir. 1992).

## <u>CONCLUSION</u>

"When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims."  *Al's Serv. Ctr. v. BP Prod. No. Am, Inc.*, 599 F.3d 720, 727 (7th Cir. 2010).   Because Plaintiff's Seconded Amended Complaint does not state a federal claim that is ripe for adjudication, Defendant's Motion to Dismiss [35] is granted. This case is dismissed without prejudice to Plaintiff's state law claims, and Case No. 18 C 961 will be remanded to the Circuit Court of Cook County.

ENTER:

Dated:  September 28, 2018           _____

REBECCA R. PALLMEYER
United States District Judge